## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| BOBBIE HUDGINS, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>vs.<br><br>RADIUS GLOBAL SOLUTIONS, LLC,<br><br>Defendant. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      Plaintiff Bobbie Hudgins ("Plaintiff") brings this Class Action Complaint against Defendant Radius Global Solutions, LLC, ("Defendant" or "Radius") for its failure to properly secure and safeguard Plaintiff's and Class Members' protected health information ("PHI") and personally identifiable information ("PII") stored within Defendant's information network, including, without limitation, full names, treatment information, provider names, patient identification numbers, health insurance information, treatment cost information, health insurance numbers and Social Security numbers.[1]

---

[1] PHI refers to information regarding an individual's medical records and history, which is protected under the Health Insurance Portability and Accountability Act. PHI includes, for example, test results, procedure descriptions, diagnoses, personal or family medical histories and data points applied to a set of demographic information for a particular patient. PII refers to information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on their face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security numbers, passport numbers, driver's license numbers, and financial account numbers).

2.      Defendant has caused, and will continue to cause, harm to individuals like Plaintiff and the class as a result of the massive and preventable cyberattack purportedly discovered by Defendant on June 1, 2023, in which cybercriminals infiltrated Defendant's inadequately protected network servers and accessed highly sensitive PHI/PII that was being kept unprotected ("Data Breach").

3.      Plaintiff further seeks to hold Defendant responsible for not ensuring that PHI/PII was maintained in a manner consistent with industry standards, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rule (45 CFR, Part 160 and Parts A and E of Part 164), the HIPAA Security Rule (45 CFR Part 160 and Subparts A and C of Part 164), and other relevant standards.

4.      While Defendant claims to have discovered the breach as early as June 1, 2023, Defendant did not inform victims of the Data Breach until at least August 9, 2023, and Plaintiff did not receive notice until after September 9, 2023. Indeed, Plaintiff and Class Members were wholly unaware of the Data Breach until they received letters from Defendant informing them of it.

5.      Defendant acquired, collected, and stored Plaintiff's and Class Members' PHI/PII. Therefore, at all relevant times, Defendant knew or should have known that Plaintiff and Class Members would use Defendant's services to store and/or share sensitive data, including highly confidential PHI/PII.

6.      HIPAA establishes national minimum standards for protecting individuals' medical records and other protected health information. HIPAA, generally, applies to health plans/insurers, healthcare clearinghouses, and those healthcare providers that conduct certain healthcare transactions electronically; and sets minimum standards for Defendant's maintenance of Plaintiff's and Class Members' PHI/PII. More specifically, HIPAA requires appropriate safeguards be maintained by organizations such as Defendant to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of such information without customer/patient authorization. HIPAA also

2

establishes a series of rights over Plaintiff's and Class Members' PHI/PII, including rights to examine and obtain copies of their health records and to request corrections thereto.

7.      Additionally, the HIPAA Security Rule establishes national standards to protect individuals' electronic protected health information created, received, used, or maintained by a covered entity. The HIPAA Security Rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information.

8.      By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PHI/PII, Defendant assumed legal and equitable duties to those individuals. These duties arise from HIPAA, other federal and state statutes and regulations, and common law principles. Plaintiff does not bring claims in this action for direct violations of HIPAA, but charges Defendant with various legal violations merely predicated upon the duties set forth in HIPAA.

9.      Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, and/or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiff's and Class Members' PHI/PII was safeguarded, failing to take available steps to prevent unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data— even for internal use. As a result, Plaintiff's and Class Members' PHI/PII was compromised through disclosure to an unknown and unauthorized third party—an undoubtedly nefarious third party seeking to profit off this disclosure by defrauding Plaintiff and Class Members in the future. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe and are entitled to injunctive and other equitable relief.

## JURISDICTION AND VENUE

10.      Jurisdiction is proper in this Court under 28 U.S.C. § 1332 (diversity jurisdiction). Specifically, this Court has subject matter and diversity jurisdiction over this

4863-9314-4963, v. 2

action under 28 U.S.C. § 1332(d) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendant.

11.    Supplemental jurisdiction to adjudicate issues pertaining to state law is proper in this Court under 28 U.S.C. § 1367.

12.    Defendant is headquartered and/or routinely conducts business in the State where this District is located, has sufficient minimum contacts in this State, has intentionally availed itself of this jurisdiction by marketing and/or selling products and/or services and/or by accepting and processing payments for those products and/or services within this State.

13.    Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events that gave rise to Plaintiff's claims took place within this District and Defendant is headquartered and/or does business in this Judicial District.

## PARTIES

14.    Plaintiff Bobbie Hudgins is a citizen of the State of Florida. Plaintiff received notice dated September 9, 2023, that she was a victim of the data breach and that at least her name, date of birth, Social Security number, treatment code, treatment location, and treatment payment history (including health insurance provider) was impacted.

15.    Defendant Radius Global Solutions, LLC, is a Minnesota limited liability corporation, with a principal place of business located at 7831 Glenroy Rd., Suite 250, Minneapolis, MN 55439.

16.    Defendant is a professional debt collection agency servicing the medical, retail and bankcard markets, as well as a broad range of additional markets and clients nationwide. According to its website, Defendant offers Debt Collection for any industry, "We offer outsourced debt collection services across most industries. Our customized solutions and omni channel approach focus on customer satisfaction and help collect

4

4863-9314-4963, v. 2

payments and settle outstanding balances."[2] Defendant states its mission to be "to help you exceed your customers' expectations within a highly collaborative, secure, and compliant environment."[3]

## **FACUTAL ALLEGATIONS**

### **The Data Breach and Defendant's Response**

17.     During the Data Breach, one or more unauthorized third parties accessed Class Members' sensitive data including, but not limited to full names, treatment information, provider names, patient identification numbers, health insurance information, treatment cost information, and health insurance numbers. Plaintiff was among the individuals whose data was accessed in the Data Breach.

18.     According to Defendant, the Data Breach occurred when files became accessible to "unauthorized actors due to the MOVEit vulnerability exploitation." According to the "Notice of Data Event" mailed to Plaintiff, dated September 9, 2023 (the "Notice"):

> **What Happened?** On June 1, 2023, Radius learned of a vulnerability in the MOVEit web transfer application that Radius, along with several thousand other companies and government agencies, utilizes for transferring documents. Upon learning cybercriminals exploited the vulnerability, Radius immediately investigated its MOVEit database to assess its security and to identify any documents that may have been accessed by unauthorized actors. After determining some documents were accessed, Radius conducted a comprehensive review of the impacted files to determine what information was present in the impacted files, to whom the information related, and contact information for applicable individuals. We are notifying you because our review recently determined some of your information was present in the files accessible to the unauthorized actors due to the MOVEit vulnerability exploitation.
> **What Information Was Involved?** The potentially impacted information included your name, date of birth, Social Security number, treatment code,

---

[2] *Debt Collection For Any Industry, https://www.radiusgs.com/what-we-do/debt-collection-services/* (last visited August 25, 2023).

[3] *Our mission, https://www.radiusgs.com/about-us/* (last visited August 25, 2023).

treatment location, and treatment payment history (including health insurance provider).

**What We are Doing.** Upon learning of the MOVEit vulnerability, we immediately investigated to determine any risk to information in the database. We promptly reviewed the identified documents so we could notify relevant individuals. We continue to implement necessary patching and measures to secure the MOVEit database as we learn new information. As an added precaution, we are offering you 24 months of complimentary identity monitoring services. Activation instructions are included on the following pages.

**What You Can Do.** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing account statements and monitoring free credit reports for suspicious activity and errors. We also encourage you to review the information contained in the *Steps You Can Take to Help Protect Information* section and activate the complimentary identity monitoring services we are offering.[4]

19.    Plaintiff was provided the information detailed above upon her receipt of the Notice and was not aware of the Data Breach prior to receiving the Notice.

20.    Not until roughly three months after it claims to have discovered the Data Breach did Defendant send Notice to Plaintiff; upon information and belief, Defendant has sent notices since approximately late August 2023 to persons whose PHI/PII Defendant confirmed was potentially compromised because of the Data Breach. The Notice confirms that Plaintiff must take action and remain vigilant with her PHI and PII and that she is at an increased risk of harm from identity theft.

21.    The Notice included, inter alia, the claims that Defendant had learned of the Data Breach on June 1, 2023, and had taken steps to respond. But the Notice lacked sufficient information on how the Data Breach occurred, what safeguards have been taken since then to safeguard further attacks, and where the stollen information exists today.

22.    Defendant warehouses and works with information that is highly valuable to cyber criminals, and the unauthorized third-party cybercriminals gained access to

---

[4]    A copy of the Notice is also posted on Defendant's website. *See* https://www.radiusgs.com/wp-content/uploads/2023/08/Radius_Envision-Website_Notice.pdf (last visited Sept. 28, 2023).

4863-9314-4963, v. 2

Plaintiff's and Class Members' PHI/PII with the intent of misusing the PHI/PII, including marketing and selling the PHI/PII.

23.    Defendant had and continues to have obligations created by HIPAA, applicable federal and state law as set forth herein, reasonable industry standards, common law, and its own assurances and representations to keep Plaintiff's and Class Members' PHI/PII confidential and to protect such PHI/PII from unauthorized access.

24.    Plaintiff and Class Members were required to provide their PHI/PII to the parties from which Defendant bought medical debt to receive healthcare, and as part of that process Defendant created, collected, and stored Plaintiff's and Class Members' PHI/PII with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

25.    Despite this, even today, Plaintiff and Class Members have not been told sufficient information regarding what data was stolen, the particular malware used, and what steps are being taken to secure their PHI/PII in the future. Thus, Plaintiff and Class Members are left to speculate as to where their PHI/PII ended up, who has used it, and for what potentially nefarious purposes. Indeed, they are left to further speculate as to the full impact of the Data Breach and how Defendant intends to enhance its information security systems and monitoring capabilities to prevent further breaches.

26.    Plaintiff's and Class Members' PHI/PII may end up for sale on the dark web or fall into the hands of companies that will use the detailed PHI/PII for targeted marketing without Plaintiff's and/or Class Members' approval. Either way, unauthorized individuals can now easily access Plaintiff's and Class Members' PHI/PII.

**Defendant Collected/Stored Plaintiff's and Class Members' PHI/PII**

27.    Defendant acquired, collected, stored, and assured reasonable security over Plaintiff's and Class Members' PHI/PII.

28.    As a condition of its relationships with Plaintiff and Class Members, Defendant required that Plaintiff and Class Members entrust Defendant with highly sensitive and confidential PHI/PII. Defendant, in turn, stored that information on Defendant's system that was ultimately affected by the Data Breach.

29.    By obtaining, collecting, and storing Plaintiff's and Class Members' PHI/PII, Defendant assumed legal and equitable duties over the PHI/PII and knew or should have known that it was thereafter responsible for protecting Plaintiff's and Class Members' PHI/PII from unauthorized disclosure.

30.    Plaintiff and Class Members have taken reasonable steps to maintain their PHI/PII's confidentiality. Plaintiff and Class Members relied on Defendant to keep their PHI/PII confidential and securely maintained, to use this information for business and healthcare purposes only, and to make only authorized disclosures of this information.

31.    Defendant could have prevented the Data Breach, which began prior to June 2023, by properly securing and encrypting and/or more securely encrypting its servers, generally, as well as Plaintiff's and Class Members' PHI/PII. Defendant's notice includes no indications that it monitored or otherwise secured the MOVEit tool prior to notification of the Data Breach.

32.    Defendant's negligence in safeguarding Plaintiff's and Class Members' PHI/PII is exacerbated by repeated warnings and alerts directed at protecting and securing sensitive data, as evidenced by the trending data breach attacks in recent years.

33.    The healthcare industry has experienced many high-profile cyberattacks in the last several years preceding this Complaint's filing. Cyberattacks, generally, have become increasingly more common. More healthcare data breaches were reported in 2020

4863-9314-4963, v. 2

than in any other year, showing a 25% increase.[5] According to the HIPAA Journal, the largest healthcare data breaches were reported in April 2021.[6]

34.    Healthcare related breaches have continued to rapidly increase because electronic patient data is seen as a valuable asset.  According to the 2019 HIMSS Cybersecurity Survey, 82% of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[7]  "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time.  From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[8]

35.    For example, Universal Health Services experienced a cyberattack on September 29, 2020, similar to the attack on Defendant. As a result of this attack, Universal Health Services suffered a four-week outage of its systems which caused as much as $67 million in recovery costs and lost revenue.[9] Similarly, in 2021, Scripps Health suffered a cyberattack, which effectively shut down critical healthcare services for a month and left numerous patients unable to speak to their physicians or access vital medical and

---

[5] https://www.hipaajournal.com/2020-healthcare-data-breach-report/ (last visited July 24, 2023).

[6]  https://www.hipaajournal.com/april-2021-healthcare-data-breach-report/  (last  visited July 24, 2023).

[7]    *2019    HIMSS    Cybersecurity    Survey,* https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_ Final_Report.pdf (last visited June 2, 2023).

[8] Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, Chief Healthcare    Executive    (Apr.    4,    2019), https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited June 2, 2023).

[9]  https://www.prnewswire.com/news-releases/universal-health-services-inc-reports-2020-fourth-quarter-and-full-year-financial-results-and-2021-full-year-earnings-guidance-301236075.html/ (last visited July 24, 2023).

prescription records.[10] University of San Diego Health suffered a similar attack a few months later.[11]

36.     Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[12]

37.     The HIPAA Journal article explains that patient records, like those stolen from Defendant, are "often processed and packaged with other illegally obtained data to create full record sets (full) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals, which "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[13]

38.     Businesses that store personal information are likely to be targeted by cyber criminals.  Credit card and bank account numbers are tempting targets for hackers, but credit and debit cards can be cancelled, quickly mitigating the hackers' ability to cause further harm.  Instead, PHI and types of PII that cannot be easily changed (such as dates of birth and Social Security numbers) are the most valuable to hackers.[14]

---

[10]   https://www.nbcsandiego.com/news/local/scripps-health-employees-regaining-access-to-internal-systems-hit-by-cyberattack-2/2619540/ (last visited July 24, 2023).

[11]   https://www.nbcsandiego.com/news/local/data-breach-at-uc-san-diego-health-some-employee-email-accounts-impacted/2670302/ (last visited July 24, 2023).

[12] *Editorial: Why Do Criminals Target Medical Records,* HIPAA J. (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records/

[13] *Id.*

[14] *Calculating the Value of a Data Breach – What Are the Most Valuable Files to a Hacker?* Donnellon McCarthy Enters. (July 21, 2020), https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/.

39.    Defendant knew or should have known that it was an ideal target for hackers and others with nefarious purposes related to sensitive personal identifying and health information.  Defendant processed and saved multiple types, and many levels, of PII and PHI through its computer data and storage systems.

40.    Indeed, the Federal Bureau of Investigation ("FBI") has expressed concern about data security in the healthcare industry.  The FBI has been warning companies within the healthcare industry, like Defendant, that hackers are targeting them.  The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PHI)."[15]

41.    The American Medical Association ("AMA") has also warned healthcare companies like Defendant about the importance of protecting their patients' confidential information: "Cybersecurity is not just a technical issue; it's a patient safety issue.  AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care."[16]

42.    Due to the high-profile nature of these breaches and other breaches of its kind, Defendant was and/or certainly should have been on notice and aware of such attacks occurring in the healthcare industry and, therefore, should have assumed and adequately performed the duty of preparing for such an imminent attack.

---

[15] Jim Finkle, *FBI warns healthcare firms that they are targeted by hackers*, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[16] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AMA (Oct. 4, 2016), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

11

43. And yet, despite the prevalence of public announcements of data breaches and data security compromises, Defendant failed to take appropriate steps to protect Plaintiff's and Class Members' PHI/PII from being compromised.

**Defendant Had a Duty to Protect the Stolen Information**

44. In failing to adequately secure Plaintiff's and Class Members' sensitive data, Defendant breached duties it owed Plaintiff and Class Members under statutory and common law. Under HIPAA, health insurance providers and business associates have an affirmative duty to keep patients' protected health information private. As a covered entity, Defendant has a statutory duty under HIPAA and other federal and state statutes to safeguard Plaintiff's and Class Members' data. Moreover, Plaintiff and Class Members surrendered their highly sensitive personal data to Defendant under the implied condition that Defendant would keep it private and secure. Accordingly, Defendant also had an implied duty to safeguard their data, independent of any statute.

45. Because Defendant is covered by HIPAA (45 C.F.R. § 160.102), it is required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

46. HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for protecting health information.

47. HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

48. HIPAA requires Defendant to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

4863-9314-4963, v. 2

49.    "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

50.    HIPAA's Security Rule requires Defendant to: (1) ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits; (2) protect against any reasonably anticipated threats or hazards to the security or integrity of such information; (3) protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and (4) ensure compliance by its workforce.

51.    HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information" under 45 C.F.R. § 164.306(e), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

52.    Moreover, the HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."

53.    Defendant was also prohibited by the Federal Trade Commission Act (the "FTCA") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTCA. See, e.g., FTC v. Wyndham Worldwide Corp., 799 F.3d 236 (3d Cir. 2015).

54.    According to the FTC, the need for data security should be factored into all business decision-making. To that end, the FTC has issued numerous guidelines

identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PHI/PII.

55.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business. The guidelines explain that companies should protect the sensitive consumer information that they keep; properly dispose of PHI/PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.

56.    The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

57.    The FTC recommends that companies not maintain information longer than is necessary for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor for suspicious activity on the network and verify that third-party service providers have implemented reasonable security measures.

58.    The FTC has brought enforcement actions against businesses for failing to protect consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

59.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumers' PHI/PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

60.    In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining,

securing, safeguarding, deleting, and protecting the PHI/PII in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected Plaintiff's and Class Members' PHI/PII.

61.    Defendant owed a duty to Plaintiff and Class Members to design, maintain, and test its computer systems, servers, and networks to ensure that all PHI/PII in its possession was adequately secured and protected.

62.    Defendant owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect all PHI/PII in its possession, including not sharing information with other entities who maintain sub-standard data security systems.

63.    Defendant owed a duty to Plaintiff and Class Members to implement processes that would immediately detect a breach of its data security systems in a timely manner.

64.    Defendant owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

65.    Defendant owed a duty to Plaintiff and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' PHI/PII from theft, because such an inadequacy would be a material fact in the decision to entrust this PHI/PII to Defendant.

66.    Defendant owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

67.    Defendant owed a duty to Plaintiff and Class Members to encrypt and/or more reliably encrypt Plaintiff's and Class Members' PHI/PII and monitor user behavior and activity to identify possible threats.

**The Sensitive Information Stolen in the Data Breach is Highly Valuable**

68.   It is well known that PHI/PII, including Social Security numbers and health records in particular, is a valuable commodity and a frequent, intentional target of cybercriminals. Companies that collect such information, including Defendant, are well aware of the risk of being targeted by cybercriminals.

69.   Given the substantial increase in cyberattacks, data disclosures, and/or data breaches targeting corporations, Defendant's data security obligations were particularly important.

70.   Data breaches, including those perpetuated against service providers that store personal information in their systems, have become widespread.

71.   In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.

72.   The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.

73.   Individuals place a high value not only on their PHI/PII but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight the impact of identity theft.

74.   While the greater efficiency of electronic health records translates to cost savings for providers, it also comes with the risk of privacy breaches. These electronic health records contain a lot of sensitive information (e.g., patient data, patient diagnosis, lab results, medications, prescriptions, and treatment plans) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, PHI/PII is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly,

the healthcare industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

75.    The high value of PHI/PII to criminals is evidenced by the prices they will pay for it through the dark web. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[17] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[18] Criminals can also purchase access to entire company data breaches from $999 to $4,995.[19]

76.    Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[20] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[21] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[22]

77.    These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members. For example, it is believed that certain PHI/PII compromised in the 2017 Experian data breach was being used three years later

---

[17] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited July 24, 2023).

[18] *Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian,* Dec. 6, 2017, available at: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited July 24, 2023).

[19] *In the Dark,* VPNOverview, 2019, available at:
https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited July 24, 2023).

[20]    https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/ (last visited July 24, 2023).

[21]    https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/    (last visited July 24, 2023).

[22]    https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches/ (last visited July 24, 2023).

4863-9314-4963, v. 2

by identity thieves to apply for COVID-19-related benefits in Oklahoma. Such fraud will be an omnipresent threat for Plaintiff and Class Members for the rest of their lives. They will need to remain constantly vigilant.

78.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government-issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."

79.    Identity thieves can use PHI/PII, such as that of Plaintiff and Class Members which Defendant failed to keep secure, to perpetrate various crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, using the victim's information to obtain government benefits, or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

80.    The ramifications of Defendant's failure to secure Plaintiff's and Class Members' PHI/PII are long-lasting and severe. Once PHI/PII is stolen, particularly identification numbers, fraudulent use of that information and damage to victims may continue for years. Indeed, the PHI/PII of Plaintiff and Class Members was taken by hackers to engage in identity theft or to sell it to other criminals who will purchase the PHI/PII for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

81.    Individuals, like Plaintiff and Class Members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and are likened to accessing DNA for hacker's purposes.

82.    Data breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiff and Class Members cannot obtain new numbers unless they become victims of Social Security misuse.

83.    The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[23]

84.    There may be a time lag between when harm occurs versus when it is discovered, and also between when PHI/PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[24]

85.    The harm to Plaintiff and Class Members is especially acute given the nature of the leaked data. Medical identity theft is one of the most common, most expensive, and most difficult-to-prevent forms of identity theft. According to Kaiser Health News, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the

---

[23] *Identity Theft and Your Social Security Number*, SSA, No. 05-10064 (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Apr. 18, 2023).
[24] *Report to Congressional Requesters*, GAO, at 29 (June 2007), available at: http://www.gao.gov/new.items/d07737.pdf (last visited July 24, 2023).

4863-9314-4963, v. 2

United States in 2013," more than identity thefts involving banking and finance, the government, and the military or education.[25]

86.    "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[26]

87.    When cybercriminals access financial information, health insurance information, and other personally sensitive data—as they did here—there is no limit to the amount of fraud to which Defendant may have exposed Plaintiff and Class Members.

88.    A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[27]Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[28]

89.    And data breaches are preventable.[29] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "[i]n almost all cases, the data breaches that occurred

---

[25] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last visited July 24, 2023).

[26] *Id.*

[27] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010),    https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited July 24, 2023).

[28] *Id.*; *see also* Healthcare Data Breach: What to Know About them and What to Do After One, EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited July 24, 2023).

[29] Lucy L. Thompson, "Despite the Alarming Trends, Data Breaches Are Preventable," in Data Breach and Encryption Handbook (Lucy Thompson, ed., 2012).

could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." [30]She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[31]

90.    Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. Appropriate information security controls, including encryption, must be implemented and enforced rigorously and disciplined so that a data breach never occurs.[32]

91.    Here, Defendant knew of the importance of safeguarding PHI/PII and of the foreseeable consequences that would occur if Plaintiff's and Class Members' PHI/PII was stolen, including the significant costs that would be placed on Plaintiff and Class Members because of a breach of this magnitude. As detailed above, Defendant knew or should have known that the development and use of such protocols was necessary to fulfill its statutory and common law duties to Plaintiff and Class Members. Therefore, its failure to do so is intentional, willful, reckless, and/or grossly negligent.

**Plaintiff's Experience**

92.    Defendant received Plaintiff's highly sensitive PHI/PII. As a result, Plaintiff's information was among the data an unauthorized third party accessed in the Data Breach.

93.    Plaintiff was and is careful about sharing her PHI/PII. Plaintiff tries to avoid knowingly transmitted unencrypted sensitive PHI/PII over the internet or any other unsecured source.

94.    Plaintiff stores documents containing her PHI/PII in a safe and secure location or destroyed the documents. Moreover, Plaintiff diligently chose unique usernames and passwords for her various online accounts.

---

[30] *Id.* at 17.
[31] *Id*. at 28.
[32] *Id*.

95.     Plaintiff took reasonable steps to maintain the confidentiality of her PHI/PII and relied on Defendant to keep her PHI/PII confidential and securely maintained, to use this information for collection purposes only, and to make only authorized disclosures of this information.

96.     Plaintiff received Notice from Defendant dated September 9, 2023, indicating her PHI and PII were compromised as a result of the Data Breach, and directing Plaintiff to be "vigilant" and protect her PHI/PII.

97.     As a result of the Data Breach, Plaintiff heeded Defendant's warnings and spent time dealing with the consequences of the Data Breach, which included time spent verifying the legitimacy of the Notice and self-monitoring her accounts and credit reports to ensure no fraudulent activity had occurred. This time has been lost forever and cannot be recaptured. Plaintiff has also placed locks on her credit through Equifax and Experian and placed a credit freeze through TransUnion.

98.     Plaintiff has suffered actual injury in the form of damages to and diminution in the value of her PHI/PII—a form of intangible property that he entrusted to Defendant, which was compromised in and because of the Data Breach.

99.     After the Data Breach, Plaintiff's credit report became littered with unwanted credit inquiries that made without her consent which are irreparably damaging her credit. In just a short period of time, her report shows credit inquires from businesses that she has no connection to demonstrating that identify thieves are hard at work opening fraudulent accounts in her name. Plaintiff's actual injuries arise from the damage done to her credit since the Data Breach and the concomitant aftermath of accounts opened in her name in her name without her consent.

100. Plaintiff has also suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling her PHI/PII.

4863-9314-4963, v. 2

101. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PHI/PII, in combination with her name, being placed in the hands of unauthorized third parties/criminals.

102. Plaintiff has a continuing interest in ensuring that her PHI/PII, which, upon information and belief remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

103. Furthermore, Defendant has offered only a limited two-year subscription for identity theft monitoring and identity theft protection. Its limitation is inadequate when the victims will likely face many years of identity theft.

104. Moreover, Defendant's credit monitoring offer and advice to Plaintiff and Class Members squarely place the burden on Plaintiff and Class Members, rather than on Defendant, to monitor and report suspicious activities to law enforcement. In other words, Defendant expects Plaintiff and Class Members to protect themselves from its tortious acts resulting from the Data Breach. Rather than automatically enrolling Plaintiff and Class Members in credit monitoring services upon discovery of the Data Breach, Defendant merely sent instructions to Plaintiff and Class Members about actions they could affirmatively take to protect themselves.

105. These services are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud, and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' PHI/PII.

106. Defendant disregarded the rights of Plaintiff and Class Members by, inter alia: (i) intentionally, willfully, recklessly and/or negligently failing to take adequate and reasonable measures to ensure that its network servers were protected against unauthorized intrusions, (ii) failing to disclose that it did not have adequate security protocols and

training practices in place to safeguard Plaintiff's and Class Members' PHI/PII, (iii) failing to take standard and reasonably available steps to prevent the Data Breach, (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time, and (v) failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

## **CLASS ACTION ALLEGATIONS**

107.  Plaintiff brings this action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiff a Nationwide Class (the "Class"):

> All individuals within the United States of America whose PHI/PII was exposed to unauthorized third parties as a result of the data breach discovered by Defendant on June 1, 2023.

108.  Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors and any entity in which Defendant has a controlling interest, all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out, any and all federal, state or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsel, and/or subdivisions, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

109.  In the alternative, Plaintiff requests additional subclasses as necessary based on the types of PHI/PII that were compromised and reserves the right to amend the above Class definitions or to propose other subclasses in subsequent pleadings and motions for class certification.

110.  This action has been brought and may properly be maintained as a class action under Fed. R. Civ. P. 23 because there is a well-defined community of interest in the litigation and membership of the proposed Classes is readily ascertainable.

4863-9314-4963, v. 2

111. Numerosity: A class action is the only available method for the fair and efficient adjudication of this controversy. The members of the Plaintiff Classes are so numerous that joinder of all members is impractical, if not impossible. Plaintiff is informed and believes and, on that basis, alleges that the total number of Class Members is in the thousands of individuals. Membership in the Classes will be determined by analysis of Defendant's records.

112. Commonality: Plaintiff and the Class Members share a community of interest in that there are numerous common questions and issues of fact and law which predominate over any questions and issues solely affecting individual members, including, but not necessarily limited to:

a. Whether Defendant had a legal duty to Plaintiff and the Class Members to exercise due care in collecting, storing, using and/or safeguarding their PHI/PII;

b. Whether Defendant knew or should have known of the susceptibility of its data security systems to a data breach;

c. Whether Defendant's security procedures and practices to protect its systems were reasonable in light of the measures recommended by data security experts;

d. Whether Defendant's failure to implement adequate data security measures allowed the Data Breach to occur;

e. Whether Defendant failed to comply with its own policies and applicable laws, regulations and industry standards relating to data security;

f. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PHI/PII had been compromised;

g. How and when Defendant actually learned of the Data Breach;

h. How Defendant determined when and to whom notice should be given of the Data Breach;

4863-9314-4963, v. 2

i.  Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the loss of the PHI/PII of Plaintiff and Class Members;

j.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

k.  Whether Defendant engaged in unfair, unlawful or deceptive practices by failing to safeguard Plaintiff's and Class Members' PHI/PII;

l.  Whether Plaintiff and Class Members are entitled to actual and/or statutory damages and/or whether injunctive, corrective and/or declaratory relief and/or an accounting is/are appropriate as a result of Defendant's wrongful conduct; and

m.  Whether Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct.

113.   Typicality: Plaintiff's claims are typical of the claims of the Plaintiff Classes. Plaintiff and all members of the Plaintiff Classes sustained damages arising out of and caused by Defendant's common course of conduct in violation of law, as alleged herein.

114.   Adequacy of Representation: Plaintiff in this class action is an adequate of each of the Plaintiff Classes in that Plaintiff has the same interest in the litigation of this case as the Class Members, is committed to the vigorous prosecution of this case, and has retained competent counsel who are experienced in conducting litigation of this nature. Plaintiff is not subject to any individual defenses unique from those conceivably applicable to other Class Members or the classes in their entirety. Plaintiff anticipates no management difficulties in this litigation.

115.   Superiority of Class Action: The damages suffered by individual Class Members are significant but may be small relative to each member's enormous expense of individual litigation. This makes or may make it impractical for members of the Plaintiff Class to seek redress individually for the wrongful conduct alleged herein. Even if Class Members could afford such individual litigation, the court system could not. Should

separate actions be brought or be required to be brought by each individual member of the Plaintiff Class, the resulting multiplicity of lawsuits would cause undue hardship and expense for the Court and the litigants. The prosecution of separate actions would also create a risk of inconsistent rulings which might be dispositive of the interests of other Class Members who are not parties to the adjudications and/or may substantially impede their ability to protect their interests adequately. Individualized litigation increases the delay and expense to all parties and to the court system, presented by the case's complex legal and factual issues. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale and comprehensive supervision by a single court.

116.  Class certification is proper because the questions raised by this Complaint are of common or general interest affecting numerous persons, so it is impracticable to bring all Class Members before the Court.

117.  This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to Class Members, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate concerning the Classes in their entireties. Defendant's policies and practices challenged herein apply to and affect Class Members uniformly. Plaintiff's challenge of these policies and procedures hinges on Defendant's conduct concerning the Classes in their entirety, not on facts or law applicable only to Plaintiff.

118.  Unless a Class-wide injunction is issued, Defendant may continue failing to secure Class Members' PHI/PII properly, and Defendant may continue to act unlawfully, as set forth in this Complaint.

119.  Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Fed. R. Civ. P. 23(b)(2).

## CAUSES OF ACTION

### COUNT ONE
**Negligence**
**(On behalf of the Nationwide Class)**

120.  Plaintiff realleges each and every allegation of the preceding paragraphs as though fully set forth herein.

121.  At all times herein relevant, Defendant owed Plaintiff and Class Members a duty of care, inter alia, to act with reasonable care to secure and safeguard their PHI/PII and to use commercially reasonable methods to do so. Defendant took on this obligation upon accepting and storing Plaintiff's and Class Members' PHI/PII on its computer systems and networks.

122.  Among these duties, Defendant was expected: (a) to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the PHI/PII in its possession; (b) to protect Plaintiff's and Class Members' PHI/PII using reasonable and adequate security procedures and systems that were/are compliant with industry-standard practices; (c) to implement processes to detect the Data Breach quickly and to act on warnings about data breaches timely; and (d) to promptly notify Plaintiff and Class Members of any data breach, security incident or intrusion that affected or may have affected their PHI/PII.

123.  Defendant knew or should have known that the PHI/PII was private and confidential and should be protected as private and confidential and, thus, Defendant owed a duty of care to not subject Plaintiff and Class Members to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

124.  Defendant knew or should have known of the risks inherent in collecting and storing PHI/PII, the vulnerabilities of its data security systems and the importance of adequate security. Defendant knew or should have known about numerous well-publicized data breaches.

4863-9314-4963, v. 2

125.   Defendant knew or should have known that its data systems and networks did not adequately safeguard Plaintiff's and Class Members' PHI/PII.

126.   Only Defendant was in a position to ensure that its systems and protocols were sufficient to protect the PHI/PII that Plaintiff and Class Members had entrusted to it.

127.   Defendant breached its duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard their PHI/PII.

128.   Because Defendant knew that a breach of its systems could damage numerous individuals, including Plaintiff and Class Members, Defendant had a duty to adequately protect its data systems and the PHI/PII stored thereon.

129.   Plaintiff's and Class Members' willingness to entrust Defendant with their PHI/PII was predicated on the understanding that Defendant would take adequate security precautions. Moreover, only Defendant could protect its systems and the PHI/PII it stored on them from attack. Thus, Defendant had a special relationship with Plaintiff and Class Members.

130.   Defendant also had independent duties under state and federal laws that required Defendant to reasonably safeguard Plaintiff's and Class Members' PHI/PII and promptly notify them about the Data Breach. These "independent duties" are untethered to any contract between Defendant, Plaintiffs, and/or the remaining Class Members.

131.   Defendant breached its general duty of care to Plaintiff and Class Members in, but not necessarily limited to, the following ways:

a.   by failing to provide fair, reasonable and/or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI/PII;

b.   by failing to timely and accurately disclose that Plaintiff's and Class Members' PHI/PII had been improperly acquired or accessed;

c.  by failing to adequately protect and safeguard PHI/PII by knowingly disregarding standard information security principles, despite obvious risks and by allowing unmonitored and unrestricted access to unsecured PHI/PII;

d.  by failing to provide adequate supervision and oversight of the PHI/PII with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather Plaintiff's and Class Members' PHI/PII, misuse the PHI/PII and intentionally disclose it to others without consent;

e.  by failing to adequately train its employees not to store data for longer than necessary;

f.  by failing to consistently enforce security policies aimed at protecting Plaintiff's and Class Members' PHI/PII;

g.  by failing to implement processes to quickly detect data breaches, security incidents or intrusions; and

h.  by failing to encrypt Plaintiff's and Class Members' PHI/PII and monitor user behavior and activity to identify possible threats.

132.  Defendant's willful failure to abide by these duties was wrongful, reckless and/or grossly negligent in light of the foreseeable risks and known threats.

133.  As a proximate and foreseeable result of Defendant's grossly negligent conduct, Plaintiff and Class Members have suffered damages and are at imminent risk of additional harm and damages (as alleged above).

134.  The law further imposes an affirmative duty on Defendant to timely disclose the unauthorized access and theft of the PHI/PII to Plaintiff and Class Members so that they could and/or still can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their PHI/PII.

135.  Defendant breached its duty to notify Plaintiff and Class Members of the unauthorized access by waiting roughly four months after learning of the Data Breach to

notify Plaintiff and Class Members and then by failing and continuing to fail to provide Plaintiff and Class Members sufficient information regarding the Data Breach. To date, Defendant has not provided sufficient information to Plaintiff and Class Members regarding the extent of the unauthorized access and continues to breach its disclosure obligations to Plaintiff and Class Members.

136. Further, by failing to provide timely and clear notification of the Data Breach to Plaintiff and Class Members, Defendant prevented Plaintiff and Class Members from taking meaningful, proactive steps to secure their PHI/PII and access their medical records and histories.

137. There is a close causal connection between Defendant's failure to implement security measures to protect Plaintiff's and Class Members' PHI/PII and the harm (or risk of imminent harm) suffered by Plaintiff and Class Members. Plaintiff's and Class Members' PHI/PII was accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PHI/PII by adopting, implementing, and maintaining appropriate security measures.

138. Defendant's wrongful actions, inactions, and omissions constituted (and continue to constitute) common law negligence.

139. The damages Plaintiff and Class Members have suffered (as alleged above) and will continue to suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

140. Additionally, 15 U.S.C. § 45 (FTCA, Section 5) prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PHI/PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

141. Defendant violated 15 U.S.C. § 45 by failing to use reasonable measures to protect PHI/PII and by not complying with applicable industry standards, as described in

4863-9314-4963, v. 2

detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PHI/PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

142. Defendant's violation of 15 U.S.C. § 45 constitutes negligence per se. Defendant also violated the HIPAA Privacy and Security rules, which constitutes negligence per se.

143. As a direct and proximate result of Defendant's negligence and negligence per se, Plaintiff and Class Members have suffered and will continue to suffer injury, including but not limited to: (i) actual identity theft, (ii) the loss of the opportunity of how their PHI/PII is used, (iii) the compromise, publication, and/or theft of their PHI/PII, (iv) out-of-pocket expenses associated with the prevention, detection and recovery from identity theft, tax fraud, and/or unauthorized use of their PHI/PII, (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from embarrassment and identity theft, (vi) lost continuity in relation to their healthcare, (vii) the continued risk to their PHI/PII, which may remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PHI/PII in its continued possession, and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PHI/PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

144. As a direct and proximate result of Defendant's negligence and negligence per se, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including but not limited to anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

145.  Additionally, as a direct and proximate result of Defendant's negligence and negligence per se, Plaintiff and Class Members have suffered and will continue to suffer the continued risks of exposure of their PHI/PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PHI/PII in its continued possession.

**<u>COUNT TWO</u>**
**Negligence *Per Se***
**(On behalf of the Nationwide Class)**

146.  Plaintiff realleges each and every allegation of the preceding paragraphs as though fully set forth herein.

147.  HIPAA requires that covered entities and business associates "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information" and "must reasonably safeguard protected health information from any intentional or unintentional use or disclosure." 45 CFR § 164.530I.

148.  The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414 requires HIPAA covered entities and their business associates to provide notification to the United States Department of Health and Human Services and prominent media outlets following a data breach or any breach of unsecured protected health information without unreasonable delay and in no event later than 60 days after discovery of a data breach.

149.  Section 5 of the FTCA, 15 U.S.C. § 45 prohibits companies such as Defendant from "using any unfair method of competition or unfair or deceptive act or practice in or affecting commerce," including failing to use reasonable measures to protect PHI/PII. In addition to the FTCA, the agency also enforces other federal laws relating to consumers' privacy and security. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

150.  In addition to the FTC rules and regulations and state law, other states and jurisdictions where victims of the Data Breach are located require that Defendant protect

33

PHI/PII from unauthorized access and disclosure and timely notify the victim of a data breach.

151. Defendant violated HIPAA and FTC rules and regulations obligating companies to use reasonable measures to protect PHI/PII by failing to comply with applicable industry standards and by unduly delaying reasonable notice of the actual breach. Defendant's conduct was particularly unreasonable given the nature and amount of PHI/PII it obtained and stored and the foreseeable consequences of a Data Breach and the exposure of Plaintiff's and Class members' highly sensitive PHI/PII.

152. Each of Defendant's statutory violations of HIPAA, Section 5 of the FTCA and other applicable statutes, rules and regulations, constitutes negligence per se.

153. Plaintiff and Class Members are within the category of persons HIPAA and the FTCA were intended to protect.

154. The harm that occurred because of the Data Breach described herein is the type of harm HIPAA and the FTC Act were intended to guard against.

155. As a direct and proximate result of Defendant's negligence per se, Plaintiff and Class Members have been damaged as described herein, continue to suffer injuries as detailed above, are subject to the continued risk of exposure of their PHI/PII in Defendant's possession and are entitled to damages in an amount to be proven at trial.

## COUNT THREE
### Breach of Implied Contract
### (On behalf of the Nationwide Class)

156. Plaintiff realleges each and every allegation of the preceding paragraphs as though fully set forth herein.

157. Through their course of conduct, Defendant, Plaintiff and Class Members entered into implied contracts for Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' PHI/PII.

158.   Defendant required Plaintiff and Class Members to provide and entrust their PHI/PII as a condition of obtaining Defendant's services.

159.   Defendant solicited and invited Plaintiff and Class Members to provide their PHI/PII as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their PHI/PII to Defendant.

160.   As a condition of being Defendant's direct patients, Plaintiff and Class Members provided and entrusted their PHI/PII to Defendant. In so doing, Plaintiff and Class Members entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such non-public information, to keep such information secure and confidential and to timely and accurately notify Plaintiff and Class Members if their data had been breached and compromised or stolen.

161.   A meeting of the minds occurred when Plaintiff and Class Members agreed to, and did, provide their PHI/PII to Defendant, in exchange for, amongst other things, the protection of their PHI/PII.

162.   Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

163.   Defendant breached the implied contracts it made with Plaintiff and Class Members by failing to safeguard and protect their PHI/PII and by failing to provide timely and accurate notice to them that their PHI/PII was compromised because of the Data Breach.

164.   As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and Class Members have suffered and will continue to suffer: (i) ongoing, imminent and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm, (ii) actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm, (iii) loss of the confidentiality of the stolen confidential data, (iv) the illegal sale of the compromised data on the dark web, (v) lost work time, and (vi) other economic and non-economic harm.

## COUNT FOUR
### Unjust Enrichment
### (On behalf of the Nationwide Class)

165.  Plaintiff realleges each and every allegation of the preceding paragraphs as though fully set forth herein. This Count is pleaded in the alternative to the Breach of Contract Count above.

166.  Upon information and belief, Defendant funds its data-security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and Class Members.

167.  As such, a portion of the payments made by or on behalf of Plaintiff and Class Members is to be used to provide a reasonable level of data security, and the amount of each payment allocated to data security is known to Defendant.

168.  Plaintiff and Class Members conferred a monetary benefit to Defendant. Specifically, they purchased goods and services from Defendant and/or its agents and provided Defendant with their PHI/PII. In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their PHI/PII protected with adequate data security.

169.  Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PHI/PII of Plaintiff and Class Members for business purposes.

170.  Defendant enriched itself by saving the costs it reasonably should have expended in data-security measures to secure Plaintiff's and Class Members' PHI/PII. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. On the other hand, Plaintiff and Class Members suffered as a direct and proximate result of Defendant's decision to prioritize its profits over the requisite security.

4863-9314-4963, v. 2

171.   Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures mandated by industry standards.

172.   Defendant failed to secure Plaintiff's and Class Members' PHI/PII and, therefore, did not provide full compensation for the benefit of Plaintiff and Class Members.

173.   Defendant acquired the PHI/PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

174.   If Plaintiff and Class Members knew that Defendant had not reasonably secured their PHI/PII, they would not have agreed to provide their PHI/PII to Defendant.

175.   Plaintiff and Class Members have no remedy at law.

176.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer injury, including but not limited to: (i) actual identity theft, (ii) the loss of opportunity to determine how their PHI/PII is used, (iii) the compromise, publication, and/or theft of their PHI/PII, (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PHI/PII, (v) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft, (vi) the continued risk to their PHI/PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PHI/PII in its continued possession, and (vii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the impact of the PHI/PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

177.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

178.   Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## RELIEF REQUESTED

**WHEREFORE,** Plaintiff, individually and on behalf of the proposed Nationwide Class, respectfully requests that the Court enter judgment in their favor and for the following specific relief as follows:

1.   That the Court declare, adjudge, and decree that this action is a proper class action and certify the proposed class and/or any other appropriate subclasses under Fed. R. Civ. P. 23(b)(1), 23(b)(2), and/or 23(b)(3), including the appointment of Plaintiff's counsel as Class Counsel;

2.   For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

3.   That the Court enjoin Defendant, ordering it to cease and desist from similar unlawful activities;

4.   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PHI/PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

5.   For injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an Order:

    a.   requiring Defendant to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards and federal, state or local laws;

b.    requiring Defendant to delete and purge Plaintiff's and Class Members' PHI/PII unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

c.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' PHI/PII;

d.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

e.    prohibiting Defendant from maintaining Plaintiff's and Class Members' PHI/PII on a cloud-based database;

f.    requiring Defendant to segment data by creating firewalls and access controls so that, if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

g.    requiring Defendant to conduct regular database scanning and securing checks;

h.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PHI/PII, as well as protecting the PHI/PII of Plaintiff and Class Members;

i.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraph, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting PHI/PII;

4863-9314-4963, v. 2

j.      requiring Defendant to implement, maintain, review, and revise as necessary a threat management program to monitor Defendant's networks for internal and external threats appropriately, and assess whether monitoring tools are properly configured, tested, and updated;

k.      requiring Defendant to meaningfully educate all Class Members about the threats they face from the loss of their confidential PHI/PII to third parties, as well as the steps affected individuals must take to protect themselves.

6.      For prejudgment interest on all amounts awarded, at the prevailing legal rate;

7.      For an award of attorney's fees, costs, and litigation expenses, as allowed by law; and

8.      For all other Orders, findings and determinations identified and sought in this Complaint.

## JURY DEMAND

Plaintiff, individually and on behalf of the Nationwide Class hereby demands a trial by jury for all issues triable by jury.

Dated: September 29, 2023

*/s/ Kate M. Baxter-Kauf*
Kate M. Baxter-Kauf (MN #0392037)
Karen Hanson Riebel (MN #0219770)
Rebecca A. Peterson (MN #0392663)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
kmbaxter-kauf@locklaw.com
khriebel@locklaw.com
rapeterson@loklaw.com

**GEORGE FELDMAN MCDONALD, PLLC**

Lori G. Feldman*
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Telephone: (917) 983-9321
Facsimile (888) 421-4173
lfeldman@4-justice.com
eservice@4-justice.com

**GEORGE FELDMAN
MCDONALD, PLLC**
David J. George*
Brittany L. Brown*
9897 Lake Worth Road, Suite 302
Lake Worth, FL 33467
Telephone: (844) 887-6012
dgeorge@4-justice.com
bbrown@4-justice.com

*Pro hac vice forthcoming*

*Attorneys for Plaintiff*

41